IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMIA HUNTER, | ) | CASE NO. 1:07CV00483 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| PAT ANDREWS, Warden, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2). Thomia Hunter ("Hunter") petitions this court for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 on August 1, 2007. Thomia is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to a journal entry of sentence in the case of *State of Ohio v. Hunter*, Case No. CR 454156 (Cuyahoga County 2004). For the reasons given below the magistrate judge recommends that the petition be denied.

I

The May 2004 term of the Cuyahoga County grand jury indicted Hunter on two counts of murder and one count of felonious assault. The state appellate court reviewing Hunter's conviction described the following facts as relevant to the case:

{¶ 2} In July 2004, the Cuyahoga County Grand Jury returned a three-count indictment against Hunter. Counts one and two charged her with murder in violation of R.C. 2903.02(A) and (B), respectively. Count three charged her with felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony.

{¶ 3} The trial court subsequently denied Hunter's motion to suppress oral statements.

{¶ 4} Testimony at trial demonstrated that during the early morning hours of June 17, 2004, Cleveland police and an EMS unit responded to Hunter's 911 call regarding "two people stabbed" at her apartment located at 10701 Woodland. When EMS arrived on the scene, Hunter was standing outside the doorway of her apartment, waving the emergency vehicles to her apartment, and Andrew Harris was lying on his back on the floor inside the apartment, near the front doorway. There was blood on the floor and on Harris. When the EMS technicians removed his jeans in an attempt to treat him, a "bucket of blood" poured onto the floor.

{¶ 5} While the EMS technicians attempted to resuscitate Harris, Hunter kicked at his foot and told him to "get up; quit playing." When EMS technician Daniel Nemeth attempted to remove Hunter from the apartment, she told him, "I don't know why you're messing with him. I'm the one that's stabbed." None of the EMS technicians who examined Hunter found any stab wound on her, however.

{¶ 6} Officer Jaclyn Skiba testified that when she walked up to Hunter as she stood outside her apartment, Hunter told her, "He can't be dead. I stabbed him in the leg." Skiba testified that she then arrested Hunter and advised her of her *Miranda* rights. According to Skiba, Hunter was coherent and appeared to understand her rights, although she was "shaken up" and concerned about Harris' condition. Hunter then told Skiba that she and Harris had been drinking that day at her mother's house and had begun arguing there. The argument continued when they reached Hunter's apartment. Hunter then again told Skiba, "He can't be dead; I only stabbed him in the leg."

{¶ 7} Skiba accompanied Hunter into the EMS truck on the scene for an examination. Skiba observed only a small laceration on Hunter's left knee and Hunter did not point out any other injuries to Skiba or the EMS technicians.

{¶ 8} Cleveland Police Detective Harry Matlock spoke with Hunter a short time later as she waited in a police car at the scene. He testified that she "seemed upset" and had tears in her eyes, but did not appear to be intoxicated. After Matlock advised Hunter of her *Miranda* rights, he asked her what had happened. Hunter told him that she and Harris had been in an on-again, off-again relationship for about two years. On that day, they had been drinking at her mother's house. They returned to Hunter's apartment at approximately 10:00 p.m. and had sex. Hunter stated that they got into an argument when Harris accused her of cheating on him. Hunter told Matlock that Harris started "poking" a knife at her and, at some point, she picked up another knife and stabbed him.

{¶ 9} Matlock spoke with Hunter again several hours later after she was booked and brought to the Justice Center. He asked her to read her rights out loud from a poster hanging on the wall, and she did. Upon being questioned, she told Matlock that she understood her

rights and then reiterated what she had told him earlier. According to Matlock, she did not complain of any injuries.

{¶ 10} Two kitchen steak knives were recovered from the scene. Only one of the knives had blood on it; the blood was solely from Harris. Blood was also found on the mini-blinds in the living room of Hunter's apartment, on the kitchen floor, and on the floor of a closet in the rear of the apartment. The DNA unit of the Cuyahoga County Coroner's Office tested blood samples taken from these locations and determined that the blood was from Harris.

{¶ 11} Dr. Joseph Felo, a forensic pathologist in the Cuyahoga County Coroner's Office, performed an autopsy on Harris. He concluded that Harris had sustained nine deeper, or stab, wounds to his right chest, right armpit, right upper arm, the right side of his navel, outer left thigh, and the outside of his left knee. He also sustained thirteen "incised," or shallower, wounds to his right shoulder, left chest, the left side of his navel, right upper arm, the back of his left hand and left index finger, and the back of his fingers on his right hand. According to Dr. Felo, all of the wounds were caused by "a mild amount of force" and none of them were deep, "plunging-type" wounds.

{¶ 12} Dr. Felo determined that the stab wound to the outside of Harris' left knee was approximately three inches deep. The wound severed a major artery and a major vein behind the left knee and caused Harris to lose a significant amount of blood. According to Dr. Felo, this wound caused Harris to bleed to death within 30 minutes to an hour after he sustained the wound.

{¶ 13} Curtis Jones, a supervisor in the Trace Evidence Department of the Cuyahoga County Coroner's Office, testified that he analyzed various items of Harris' clothing for "defects," which are holes in fabric that are created by a knife or bullet. Jones found several defects on Harris' clothing, but none on the dress that Hunter was wearing at the time of her arrest. Jones determined that Harris' blood was on the left shoulder and the back of Hunter's dress.

{¶ 14} Three witnesses testified for the defense. Pamela Davis-Hemphill testified that she employed Hunter as a private police officer for two years in her private security company. She testified that Hunter was an excellent employee and that she had never received any complaints that Hunter had misused her authority.

{¶ 15} Hunter's daughter, Marshia, testified that she had observed arguments between Hunter and Harris when they lived together. She had seen Harris kick in a door and throw things around when he got angry and she once saw him slam Hunter against a couch. On another occasion after Hunter and Harris argued, she and her mother left the residence and stayed in a hotel so Harris would not find them. According to Marshia, the incidents occurred when Harris had been drinking.

{¶ 16} During her testimony, Hunter claimed self-defense. She testified that she had known Harris for seven years and had become romantically involved with him in 2001. She and Harris lived together with her daughter for a year and a half, but she ended the relationship and moved out in 2003 because she and Harris argued frequently and he would become violent. Hunter renewed her friendship with Harris in January 2004. They did not live together but occasionally had sex.

{¶ 17} Hunter testified that on June 17, 2004, she and Harris spent the day together. They began drinking at approximately 10:00 a.m. at her mother's apartment, then went to the movies with her daughter and several of her daughter's friends. After they dropped the girls off at home, they returned to her mother's apartment and continued drinking.

{¶ 18} They returned to Hunter's apartment at approximately 10:00 p.m. Hunter cooked for Harris, took a bath, and then laid down on the futon to watch TV. She and Harris had sex; she awoke a short time later when Harris began yelling at her and accusing her of cheating on him. When Hunter told Harris to leave, he hit her and knocked her back on the futon. Hunter began kicking at Harris, who attempted to fend off the kicks. When he turned around, he had a knife in his hand and cut her leg. Harris started "poking" the knife at Hunter, so she got to her feet and backed toward the kitchen. Hunter began swinging her arms to fend off Harris, but he continued to hit her. Hunter saw a knife on the kitchen counter, picked it up, and began "poking at him with the knife."

{¶ 19} Hunter testified that Harris then "picked me up by my throat and started slamming me back and forth. I was just poking at him with the knife until he let me down." When Harris let her go, Hunter fell to the ground but kept "poking" at Harris so he would back up. While Harris was backing up, he kept hitting Hunter.

{¶ 20} Hunter began running for the front door, but Harris caught her from behind and began choking her. She fell down on the futon with Harris on top of her back. Harris pulled her head back, grabbed hot sauce and poured it on her eyes, while she kept trying to poke at him with the knife. Harris got up, pulling Hunter with him, but then staggered and fell into the mini-blinds.

{¶ 21} Hunter backed away from Harris, who then gathered his things and walked to the door. When he opened the door, however, he turned around, grabbed his chest, and fell. When Harris did not move, Hunter called 911.

{¶ 22} The jury subsequently found Hunter not guilty of murder as charged in count one, but guilty of felony murder as charged in count two and guilty of felonious assault. At the sentencing hearing, the trial judge sentenced her to 15 years in prison. The trial court subsequently issued a nunc pro tunc entry changing the sentence to 15 years to life in prison.

*State v. Hunter*, 2006 WL 23252, at *1-*3 (Ohio App. Jan. 3, 2006).

Hunter filed a timely notice of appeal through new counsel on March 2, 2005. Hunter raised eight assignments of error in her appellate brief:

Assignment of Error I:

> THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HER ORAL INCULPATORY STATEMENT IN VIOLATION OF HER RIGHTS AGAINST SELF-INCRIMINATION.

Assignment of Error II:

> THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT.

Assignment of Error III:

> THE TRIAL COURT ERRED WHEN IT PERMITTED IMPROPER VICTIM IMPACT TESTIMONY TO BE HEARD BY THE JURY.

Assignment of Error IV:

> THE TRIAL COURT ERRED AND DENIED APPELLANT HER CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT DENIED DEFENSE COUNSEL'S REQUEST FOR A LESSER INCLUDED JURY INSTRUCTION.

Assignment of Error V:

> APPELLANT'S CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN APPELLANT PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT SHE ACTED IN SELF-DEFENSE.

Assignment of Error VI:

> THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A FINDING BEYOND A REASONABLE DOUBT THAT APPELLANT WAS GUILTY OF MURDER.

Assignment of Error VII:

> APPELLANT HAS BEEN DEPRIVED OF HER LIBERTY WITHOUT DUE PROCESS OF LAW WHEN SHE WAS NOT PRESENT AT THE SENTENCING.

5

>Assignment of Error VIII:
>
>>THE POST-RELEASE CONTROL TERM WAS NOT PROPERLY IMPOSED AT THE TIME OF SENTENCING.

On January 17, 2006 the state appellate court overruled Hunter's first six assignments of error but granted the last two. The court then affirmed Hunter's conviction but remanded the case for re-sentencing. On February 28, 2006 the trial court re-sentenced Hunter to 15 years to life imprisonment and five years of post-release control.

Hunter filed a notice of appeal in the Ohio Supreme Court on March 3, 2006. In her memorandum in support of jurisdiction Hunter raised three propositions of law:

>PROPOSITION OF LAW I: Where the evidence in a murder trial would support an acquittal on the murder and a conviction on a lesser-included offense, a criminal defendant is deprived of due process where the trial court refuses to instruct the jury on lesser-included and inferior-degree offenses to murder. Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.
>
>PROPOSITION OF LAW II: A defendant is deprived of due process of law when the trial court allows improper and prejudicial testimony to be presented during the State's case in chief. Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.
>
>PROPOSITION OF LAW III: Appellate counsel is ineffective when she fails to raise meritorious constitutional claims on behalf of her client. Sixth and Fourteenth Amendments to the United States Constitution; Section 10, Article I of the Ohio Constitution.

On May 24, 2006 the Ohio Supreme Court denied leave to appeal and dismissed Hunter's appeal as not involving a substantial constitutional question.

Hunter filed a petition for a federal writ of habeas corpus on February 21, 2007. Hunter's petition asserts three grounds for relief:

>**GROUND ONE:** Petitioner's right to due process of law, as guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States of America was violated when the trial court denied Petitioner's motion for jury instructions on a lesser included offense.

> **GROUND TWO:** Petitioner was deprived of her right to the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States of America when counsel failed to raise meritorious constitutional claims in Petitioner's direct appeal of right.

Respondent filed an Answer/Return of Writ on May 18, 2007 (Doc. 6). Hunter filed a Traverse on August 8, 2007 (Doc. 9). Thus, the petition is ready for decision.

II

*A. Jurisdiction*

Writs of habeas corpus may be granted by a district court within its respective jurisdiction:

> Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a) and (d). Hunter was convicted in the court of common pleas in Cuyahoga County, Ohio, and filed her writ of habeas corpus in the Northern District of Ohio. This court has jurisdiction over Hunter's petition.

*B. Evidentiary hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in state court proceedings. 28 U.S.C. § 2254(e)(2). There is no need for an evidentiary hearing in the instant case. Hunter's claims involve legal issues which can be independently resolved without additional factual inquiry.

*C. Exhaustion of state remedies*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus. 28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790,

793 (6th Cir. 1991). If any state procedures for relief remain available, the petitioner has not exhausted state remedies. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies. *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989). "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard*, 404 U.S. at 275; *see also Harris v. Reeves*, 794 F.2d 1168. 1174 (6th Cir. 1986). The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims. *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Hunter has no remaining state remedies for her claims. Because Hunter has no remaining state remedies, her claims have been exhausted.

*D.    Procedural default*

Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). When a petitioner

> has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the state argues that a petitioner has procedurally defaulted, the court must conduct a four-

8

step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). A default also will be excused if petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Respondent claims that Hunter has defaulted any argument in her first ground for relief that the failure to instruct the jury regarding the lesser-included offenses of aggravated assault, voluntary manslaughter, or any theory of culpability other than reckless homicide. Hunter does not contest respondent's claim.

In her brief to the Ohio Supreme Court, Hunter argued that the trial court erred in not instructing the jury regarding the lesser-included offenses of reckless homicide, aggravated assault, and voluntary manslaughter. Memorandum in Support of Jurisdiction, Answer, Exh. 15, pp. 6-8. In her brief to the state appellate court, however, Hunter argued only that the trial court erred in not instructing the jury regarding the lesser-included offense of reckless homicide. Appellant's Brief, Answer, Exh. 8, pp. 19-22.

Under Ohio law, a criminal constitutional question cannot ordinarily be raised in the Ohio

9

Supreme Court unless it is first presented in the court below. *State v. Jester*, 32 Ohio St. 3d 147, 154, 512 N.E.2d 962, 970 (1987). In dismissing Hunter's appeal, the Ohio Supreme Court did not specify the reasons for its dismissal. Where the state courts are silent as to the reasons for denying a petitioner's claim, the Sixth Circuit has applied the presumption that the state court "would not have ignored its own procedural rules and would have enforced the procedural bar." *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996). This court must assume, therefore, that the Ohio Supreme Court dismissed Hunter's appeal with respect to the failure to instruct the jury regarding aggravated assault and voluntary manslaughter because Hunter failed to present that claim to the court below. Hunter does not argue that the rule stated in *Jester* is not an adequate and independent ground on which Ohio may rely to foreclose habeas review.

For these reasons, the magistrate judge recommends that the court dismiss as procedurally defaulted that portion of Hunter's first ground for relief arguing that trial court erred in failing to instruct the jury regarding the lesser-included offenses of aggravated assault, voluntary manslaughter, or any theory of culpability other than reckless homicide.

III

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000); *Miller v. Francis*, 269 F.3d 609, 613-14 (6th Cir. 2001). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 405 (emphasis added by the quoting court). A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result. *Id.* "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand. *Doan v. Brigano*, 237 F.3d 722, 729-31 (2001). If a court fails to identify the correct legal principal at issue, the "unreasonable application of" clause does not apply. *Id.* at 730.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."

11

28 U.S.C. § 2254(e)(1).  The petitioner, however, may rebut "the presumption of correctness by clear and convincing evidence."  *Id.*  The magistrate judge will consider Hunter's claims under the deferential standard of review accorded the state court's adjudication of a prisoner's constitutional claims.

A.      *Failure to instruct the jury as to a lesser-included offense*

Hunter contends that she was denied her right to due process when the trial court refused to instruct the jury as to reckless homicide under the facts of the case.  Respondent denies that the trial court erred in instructing the jury.

The right to a fair trial is a right implicit in the due process clauses of the Fifth and Fourteenth Amendments.  *See United States v. Agurs*, 427 U.S. 97, 107 (1976).  The analysis of alleged violations of the right is identical under either amendment.  *Id.*  Under some circumstances, jury instructions may be so erroneous as to deprive a defendant of the right to a fair trial.  But as the Supreme Court noted in *Cupp. v. Naughten*, 414 U.S. 141, 146 (1973), "Before a federal court may overturn a conviction resulting from a state trial in which [an erroneous] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."

In a capital case, the Eighth Amendment's ban on cruel and unusual punishment requires that state defendants be granted jury instructions on lesser-included offenses when such instructions are warranted by the evidence.  *Beck v. Alabama,* 447 U.S. 625 (1980); *see also* the analysis of *Beck* in *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990).  In a non-capital case, habeas relief may only be granted for an erroneous failure to provide a jury instruction on a lesser-included offense

12

"where a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law." *Bagby*, 894 F.2d at 795.

The state appellate court reviewing Hunter's conviction and sentence made the following relevant findings regarding the assignment of error paralleling this ground for relief:

{¶ 59} In her fourth assignment of error, Hunter contends that the trial court erred in denying her request to instruct the jury regarding the lesser included offense of reckless homicide as defined in R.C. 2903.041.

{¶ 60} Reckless homicide is a lesser included offense of felony murder. *State v. Berry,* Cuyahoga App. No. 83756, 2004-Ohio-5485, at ¶ 48. The difference between felony murder and reckless homicide is in the requisite mens rea. As noted earlier, one acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person acts recklessly, however, when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C).

{¶ 61} Even though an offense may be a lesser included offense of another, a charge on the lesser included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.

{¶ 62} We find no evidence in the record to support an instruction that Hunter acted recklessly, rather than knowingly. Indeed, Hunter testified that she "poked" the knife at Harris to intentionally defend herself against his attack. Although she may not have intended to kill him, it is apparent that she intended to injure him. Her actions were purposeful and not merely reckless.

*State v. Hunter*, 2006 WL 23252, at *8-*9 (Ohio App. Jan. 3, 2006).

Hunter argues that the state appellate court erred in finding that Hunter acted knowingly in seeking to defend herself against Harris's attack or in intending to injure him. In support of this argument, Hunter recites the circumstances of the alleged attack on her, including the difference in size between Harris and Hunter, Harris's relentless attack, and Hunter's alleged lack of awareness.

13

Traverse at 10-11. Thus, Hunter does not disagree with the state appellate court's statement of the law. Rather, Hunter disputes the court's factual finding that Hunter knowingly injured Harris. Hunter fails to offer clear and convincing evidence that the state appellate court erred in making this finding. This court must presume, therefore, that the state appellate court's factual finding was correct. For this reason, the magistrate judge recommends that the court overrule Hunter's first ground for relief.

*B.     Ineffective assistance of appellate counsel*

Hunter claims that her appellate counsel erred in failing to raise on appeal the ineffective assistance of trial counsel for failing to request jury instructions for aggravated assault and voluntary manslaughter. Respondent denies that appellate counsel was ineffective.

Defendants have a right to appointed counsel for the first appeal of right. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). An appellant has no constitutional right to have every nonfrivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues on appeal are properly left to the sound judgment of counsel. *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.), *cert. denied*, 498 U.S. 1002 (1990). The standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), is applicable to claims of ineffective assistance of appellate counsel. *See Bowen v. Foltz*, 763 F.2d 191, 194 n.4 (6th Cir. 1985).

Petitioner's counsel was ineffective if "counsel's conduct so undermined the proper functioning of the adversarial process that the [process] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *see also Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997). A claim of ineffective assistance of counsel has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the

14

> "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *see also Groseclose*, 130 F.3d at 1167.

The first prong of this test, the showing of deficient performance, is an objective one: "[T]he proper standard for attorney performance is that of reasonably effective assistance. . . . When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged by "prevailing professional norms." *Strickland*, 466 U.S. 687-88; *see also Groseclose*, 130 F.3d at 1167. Scrutiny of counsel's performance is highly deferential to avoid second-guessing an adverse decision. *Strickland*, 466 U.S. at 689; *see also Groseclose*, 130 F.3d at 1167. The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Groseclose*, 130 F.3d at 1167. A court reviewing counsel's performance "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Id.* at 690-91 (1984); *see also Groseclose*, 130 F.3d at 1167-6.

The second prong of the test for ineffective assistance of counsel is whether the error prejudiced petitioner:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any

15

>deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland*, 466 U.S. at 690-91 (citations omitted); *see also Groseclose*, 130 F.3d at 1168. Further "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Showing a constitutional violation requires showing that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A reviewing court must ask itself "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; *see also Groseclose*, 130 F.3d at 1168.

Hunter's appellate counsel asserted eight assignments of error on appeal. The state appellate court found two of those assignments of error to be meritorious and remanded the case for re-sentencing. To raise additional assignments of error under these circumstances, appellate counsel would have to think that the additional claims are so clearly meritorious that they would not distract the appellate court from claims whose value was later proven by the appellate court's grant of relief.

A claim of ineffective assistance of trial counsel for failing to request jury instructions for aggravated assault and voluntary manslaughter is not that sort of claim. Hunter was found guilty of murder in violation of Ohio Rev. Code § 2903.02(B) ("§ 2903.02(B)"): "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code." An

16

instruction for aggravated assault would have reduced the level of the felony offense to the fourth degree and offered the jury a violent felony that could not ground a conviction for murder pursuant to § 2903.02(B). Similarly, an instruction for voluntary manslaughter would also have offered the jury a violent felony that could not ground a conviction for murder pursuant to § 2903.02(B).

Both aggravated assault and voluntary manslaughter, however, require a finding that the offender acted in a sudden passion or in a sudden fit of rage. *See* Ohio Rev. Code §§ 2903.03(A) and 2903.12(A). Harris suffered a total of 22 knife wounds in widely-scattered places on his body, including the right and left chest, the right armpit, the right upper arm, the right shoulder, the back of the fingers of the right hand, the back of his left hand and left index finger, the right and left side of his navel, the outer left thigh, and the outside of his left knee. None of the wounds was particularly deep or delivered with great force. It was not unreasonable for trial counsel to think that a jury might have difficulty believing that a smaller woman would have the time or skill to injure a larger man armed with a knife so many times in so many places in a "sudden passion" without sustaining serious injury, particularly since no wound was delivered with the force one would normally associate with "sudden passion."

There is an additional reason why Hunter's attorney might have thought not requesting a jury instruction for aggravated assault or voluntary manslaughter might have been sound trial strategy. Hunter asserted self-defense in response to the charge of murder. Hunter's attorney might have believed that the jury would be less likely to exonerate Hunter for the reason that she was defending herself if it were able to find Hunter guilty of a lesser charge than murder.

It was not unreasonable of appellate counsel to believe that the appellate court would not find a claim of ineffective assistance of trial counsel under these circumstances to be less meritorious

17

than the claims actually raised on appeal. Given the highly deferential scrutiny afforded trial and appellate counsels' performance and the presumption that their decisions were strategically sound, and because this appellate decision might be regarded as sound appellate strategy, the magistrate judge recommends that the court overrule Hunter's second ground for relief.

IV

For the reasons given above the magistrate judge recommends that the court deny Hunter's petition for a writ of habeas corpus.

s\ *Nancy A. Vecchiarelli*
NANCY A. VECCHIARELLI
UNITED STATES MAGISTRATE JUDGE

Dated: March 27, 2008

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v.Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**